**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0793n.06

No. 11-1497

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Jul 23, 2012*
LEONARD GREEN, Clerk

DEBRA GRIFFIN and JOY GARDNER, )
                                      )
     Plaintiffs-Appellants, )
                                        )    ON APPEAL FROM THE UNITED
v.                                   )    STATES DISTRICT COURT FOR
                                        )    THE EASTERN DISTRICT OF
FLAGSTAR BANCORP, INC., REBECCA A. )    MICHIGAN
LUCCI, ERIN ENGLAND and JOHN DOE, 1-10, )
                                        )
     Defendants-Appellees. )

BEFORE:  SUTTON, McKEAGUE, and RIPPLE,[*] Circuit Judges.

**RIPPLE, Circuit Judge**.  Debra Griffin and Joy Gardner each initiated a putative class action, later consolidated, on behalf of themselves and other participants in and beneficiaries of the Flagstar Bank 401(k) Plan (the "Plan").  They alleged that Flagstar Bancorp, Inc. ("Flagstar") and certain officials had breached their fiduciary duties in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*[1]  At the core of their complaint was the assertion that it was imprudent for the Plan to have offered, during a defined class period, Flagstar stock as an investment option to Plan participants.  The defendants moved to dismiss the complaint for failure to state a claim upon which relief could be granted.  *See* Fed. R. Civ. P. 12(b)(6).  The

---

[*]The Honorable Kenneth F. Ripple, United States Court of Appeals for the Seventh Circuit, sitting by designation.

[1]The district court's jurisdiction is predicated on 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).

district court determined that dismissal was warranted because the plaintiffs had not overcome a presumption of prudence established by circuit precedent. *See Kuper v. Iovenko*, 66 F.3d 1447, 1458-59 (6th Cir. 1995). The district court further found that, even in the absence of the presumption, the plaintiffs had not met the pleading standard established by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Consequently, the district court dismissed the case, and the plaintiffs timely appealed.[2]

We have clarified, in an intervening case, the role of the presumption of prudence by holding that it does not apply at the pleading stage. Further, we must conclude that the plaintiffs have pleaded sufficient facts to raise a plausible claim that the defendants breached their fiduciary duties. For these reasons, the complaint should not have been dismissed under Rule 12(b)(6). Accordingly, the judgment of the district court is reversed and the case is remanded for further proceedings.

# I

## BACKGROUND

### A.

At this stage of the proceedings, we must construe the plaintiffs' complaint in the light most favorable to them and accept the complaint's factual allegations as true. *McLemore v. Regions Bank*, 682 F.3d 414, 419-20 (6th Cir. 2012). The complaint alleges that Flagstar maintained the Plan,

---

[2]This court's jurisdiction is predicated on 28 U.S.C. § 1291.

which provided participants with individual retirement accounts.[3] Under the Plan, participants could choose the amount of their contributions to their individual accounts, up to a defined maximum, and could allocate their contributions and pension assets among the investment options provided by the Plan. During the class period, which began on December 31, 2006, the Plan offered twenty-three to twenty-five investment options. One of those options was the Employer Stock Investment Option, which allowed Plan participants to invest their assets in Flagstar stock.

On January 3, 2007--near the beginning of the class period--Flagstar stock was trading at $14.95 per share. Later that month, Flagstar announced a decrease in annual and fourth-quarter earnings. This announcement was the advent of a prolonged slump for Flagstar; the price of Flagstar stock dropped precipitously over the next two-and-a-half years as the bank repeatedly announced losses, lower than expected earnings and reduced or suspended dividend payments. For most of the class period, analysts did not paint a bright future for Flagstar.

In October 2007, financial analysts at Oppenheimer & Co. recommended against purchasing Flagstar stock, and analysts at Friedman Billings Ramsey reduced their target price for Flagstar stock. In January 2008, Flagstar announced that it would be reducing the size of its mortgage loan origination business. A few days later, Moody's Investors Service downgraded the bank's rating. In May, Flagstar sought to raise funds by selling common stock and convertible preferred stock at a discount. In July, analysts at Friedman Billings Ramsey again reduced their target price for

---

[3] The parties agree that the Plan is an "individual account plan" or a "defined contribution plan." *See* 29 U.S.C. § 1002(34) (defining those terms).

Flagstar stock. In October, Merrill Lynch reduced Flagstar's rating from "Buy" to "Underperform."[4]

In November, Morningstar Financial published an article reporting concerns with Flagstar's business and finances. In December, Flagstar's request to participate in the Federal Troubled Asset Relief Program was approved. During the same month, Flagstar announced that it would be selling a seventy-percent stake in the company to a distressed-debt specialist. Although New York Stock Exchange rules normally would have required shareholder approval, the sale fell within an emergency provision that obviated the approval requirement because any delay could have jeopardized seriously the financial viability of the company. According to the complaint, when the sale was announced, an analyst reported that "investors [were] no longer questioning whether Flagstar [would] survive."[5]

Over the next few months, Flagstar arranged for an injection of $522 million in capital from various sources. Nevertheless, reports about Flagstar were far from positive. In August 2009, Bloomberg News published an article about banks with non-performing loans, indicating that rates of non-performing loans of over five percent were "unsafe and unsound."[6] The article reported that Flagstar was the biggest bank in the United States with more than ten percent non-performing loans.

A bit of good news came in November 2009, when analysts at Friedman Billings Ramsey projected that losses would continue only until 2010; they expected positive earnings-per-share to begin in 2011. At the same time, however, Friedman Billings Ramsey reduced their 2009 and 2010

---

[4]R.16 at 19 ¶ 61.

[5]*Id.* at 22 ¶ 72.

[6]*Id.* at 24 ¶ 79 (internal quotation marks omitted).

earnings-per-share projections and reduced their target price for Flagstar stock by half. In December 2009, American Banker and the Detroit Free Press published articles suggesting that Flagstar was in a precarious financial position, including one economist's description of Flagstar as "a black hole."[7] That same month, Flagstar announced that it was short on funds and would have to sell 704,000,000 shares of common stock to raise money. On April 28, 2010, Flagstar stock closed at $0.681 per share.

**B.**

Debra Griffin initiated a lawsuit against the defendants on February 2, 2010. Joy Gardner filed a separate action that was later consolidated with Ms. Griffin's lawsuit. On June 4, 2010, the plaintiffs filed a consolidated amended complaint setting forth three causes of action against Flagstar and certain named and unnamed officials.[8] Count I alleged that the defendants had breached their fiduciary duties of prudence and loyalty by continuing to make Flagstar stock available as an investment option despite knowing that it was imprudent to do so and by concealing the risk of investing in Flagstar stock. Count II alleged that the defendants had breached their duty to avoid conflicts of interest by failing to engage independent fiduciaries. Count III alleged that the defendants had failed to monitor each other for violations of their respective fiduciary duties.

---

[7] *Id.* at 28 ¶ 84 (internal quotation marks omitted).

[8] The two named defendants were Rebecca A. Lucci, identified in the complaint as the "First Vice President Director Human Resources," and Erin England, similarly identified as the "first vice president, human resources, employee benefits manager." *Id.* at 6-7 ¶¶ 14, 15. The unnamed defendants include members of any committee that administered the Plan as well as the "persons who had the duty and responsibility to properly appoint, monitor and inform the" committee members. *Id.* at 7 ¶¶ 16-17.

The defendants moved to dismiss the complaint. First, they contended that the district court lacked jurisdiction because the plaintiffs lacked standing. Second, they argued that a statutory safe harbor precluded liability because the plaintiffs exercised independent control over their individual accounts. Finally, they asserted that the complaint did not state a claim for a breach of fiduciary duty, for a breach of the duty to monitor or for a conflict of interest.

After a hearing, the district court granted the defendants' motion to dismiss. In a written order, the court addressed the arguments of the parties. First, the court determined that the plaintiffs had standing. It then turned to the alleged breach of fiduciary duties and addressed whether a presumption of prudence applied at the pleading stage and, if so, whether the plaintiffs' pleadings had overcome the presumption. The court concluded that the presumption *did* apply and that the facts alleged by the plaintiffs were insufficient to state a claim in light of the presumption. The district court further concluded that, even if the presumption *did not* apply, dismissal was appropriate because the Plan participants had control over their investments and Flagstar had remained a viable banking institution despite the drop in its share price. Therefore, in the district court's view, the complaint did not state a claim for a breach of fiduciary duty. The district court further held that, without such a claim, there was no proper predicate for the failure-to-monitor claim. The district court therefore granted the defendants' motion to dismiss the complaint.

The plaintiffs timely appealed.[9]

---

[9] Standing has not been raised on appeal and, after reviewing the issue independently, we are satisfied that jurisdiction in this case is proper.

No. 11-1497
*Griffin v. Flagstar Bancorp, Inc.*

## II

## DISCUSSION

We review de novo a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6). *Pfeil v. State St. Bank & Trust Co.*, 671 F.3d 585, 590 (6th Cir. 2012). On appeal, the plaintiffs' specific contentions all center on the alleged breach of the defendants' duty to exercise prudence in the selection and monitoring of the investments offered by the Plan.[10]

## A.

The plaintiffs first contend that the district court erred in holding that the defendants were protected by a presumption that investment in the stock of the employer corporation is prudent and in accordance with ERISA requirements. *See Kuper*, 66 F.3d at 1459 (citing *Moench v. Robertson*, 62 F.3d 553, 571 (3d Cir. 1995)). Intervening circuit law resolves this question. In *Pfeil v. State Street Bank & Trust Co.*, 671 F.3d 585 (6th Cir. 2012), a case decided after the district court dismissed this case, we held that the *Kuper* presumption of prudence is evidentiary in nature and thus does not apply at the pleading stage. *Id*. at 592-93.

The second issue concerns the applicability of a statutory safe harbor that insulates fiduciaries

---

[10]The plaintiffs contend on appeal only that the district court erred by dismissing their claim for breach of the fiduciary duty of prudence. They are entirely silent as to the other claims they raised in the district court--breach of the fiduciary duty of loyalty, breach of the fiduciary duty of honesty and failure to monitor. We therefore address only the duty of prudence claim.

from liability for damages occasioned by plan participants' exercise of control over their individual accounts. *See* 29 U.S.C. § 1104(c); 29 C.F.R. § 2550.404c-1. The parties dispute the scope and applicability of the safe harbor provision, but, as with the presumption of prudence, intervening circuit precedent resolves this inquiry in favor of the plaintiffs. In *Pfeil*, we held that, even when plan participants control the allocation of their pension assets among an array of investment options offered by their plan, the safe harbor does not exempt fiduciaries from their duty to use "prudence when designating and monitoring the menu of different investment options that [are] offered." 671 F.3d at 597. Because the defendants in this case decided to offer Flagstar stock to Plan participants, *Pfeil* requires the conclusion that ERISA's safe harbor provision is not available to the defendants and therefore cannot support dismissal for failure to state a claim.

**B.**

There remains but one contention that is not settled by intervening precedent. We must decide whether the district court applied properly the pleading standards articulated by the Supreme Court in *Twombly* and *Iqbal*.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A facially plausible claim exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The plausible claim standard is less than "a 'probability requirement,'" but requires more than pleading facts that are "'merely consistent with' a defendant's liability." *Id*.

(quoting *Twombly*, 550 U.S. at 556-57). In short, the "allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations omitted).

ERISA, of course, imposes on the fiduciary of an employee benefit plan the obligation to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--

> (A) for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries; and
> >
> > (ii) defraying reasonable expenses of administering the plan.

29 U.S.C. § 1104(a)(1). These management responsibilities must be conducted "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." § 1104(a)(1)(B). The fiduciary duties under ERISA "are the highest known to the law," *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002) (internal quotation marks omitted), and "[i]f a fiduciary fails to meet these high standards, he may be held personally liable for any losses to the plan that result from his breach of duty," *Kuper*, 66 F.3d at 1458 (citing 29 U.S.C. § 1109(a)).

In this case, the plaintiffs must aver a plausible claim that the defendants breached their fiduciary duty of prudence. As we have described it, the duty of prudence "imposes an unwavering

duty to act both as a prudent person would act in a similar situation and with single-minded devotion

to [the] plan participants and beneficiaries." *Id.* (internal quotation marks omitted). To survive a

motion to dismiss, then, the amended complaint in this case must plead factual content that would

allow the court reasonably to infer that, by continuing to offer Flagstar stock as an investment option

throughout the class period, the defendants did not act as a prudent person would have acted in a

similar situation. In other words, we shall reverse if the plaintiffs presented a plausible claim that

a prudent person would have discontinued offering Flagstar stock as an investment option at some

point during the class period.

In approaching this question, our discussion of the facts in *Pfeil* is instructive. In that case,

we summarized the relevant facts as follows:

> State Street became fiduciary for the plans on June 30, 2006, at a time, as the plaintiffs allege, when General Motors was already in serious financial trouble. The complaint alleges that General Motors' troubles were well-documented and that commentators increasingly opined that bankruptcy protection was "virtually a certainty" for the company. On July 15, 2008, GM Chief Executive Officer Rick Wagner announced that the company needed to implement a restructuring plan to combat second quarter 2008 losses, which he described as "significant." As part of the plan, General Motors eliminated its dividend, reduced its salaried workforce by twenty percent, and curtailed truck and large vehicle production, all signs of what plaintiff[s] contend was a "potential disaster for shareholders." The complaint alleges that on August 1, 2008, General Motors announced a third quarter net loss of $15.5 billion. These bleak reports forced the company to acknowledge in its November 7, 2008 third-quarter financials that it would exhaust cash reserves by mid–2009. Three days later, General Motors filed its Form 10–Q for third quarter 2008, disclosing that its auditors had "substantial doubt" regarding the company's "ability to continue as a going concern." The plaintiffs allege that under these circumstances, State Street should have recognized as early as July 15, 2008, that General Motors was bound for bankruptcy and that GM stock was no longer a prudent investment for the plans.

671 F.3d at 589. Similarly, albeit in the context of determining whether the plaintiffs could

overcome the presumption of reasonableness, we emphasized in *Pfeil* that the complaint "sufficiently pleaded that a prudent fiduciary acting under similar circumstances would have made a different investment decision." *Id.* at 592 (internal quotation marks omitted). The "numerous, detailed factual averments in the complaint" in that case established a plausible claim "that General Motors was on the road to bankruptcy and thus had ceased to be a prudent investment." *Id.* at 593.

Turning to the amended complaint filed in this case, we see a chronology of events during the class period laid out in some forty-seven separate paragraphs spread over sixteen pages. The complaint refers to at least ten statements by Flagstar announcing losses or declining profits, at least three announcing a reduction or suspension of dividend payments and one announcing that Flagstar would be shrinking its mortgage loan origination business. The complaint also refers to at least ten negative reports offered by analysts or published by the financial media. Those reports include, among other matters: a January 2008 report from Moody's Investors Service indicating "that continued losses would likely lead [Flagstar's] rating to junk status";[11] an October 2008 determination by Merrill Lynch to lower Flagstar's rating from "Buy" to "Underperform";[12] a November 2008 Morningstar Financial article reporting concerns with "Flagstar's business and finances";[13] and an article in late 2009 or early 2010 that described Flagstar as "a black hole."[14] As late as August 2009, the complaint alleges, Flagstar was known to have a rate of non-performing

---

[11]R.16 at 17 ¶ 50.

[12]*Id.* at 19 ¶ 61.

[13]*Id.* at 20 ¶ 64 (internal quotation marks omitted).

[14]*Id.* at 28 ¶ 84 (internal quotation marks omitted).

loans that was *more than double* the five percent rate considered "unsafe and unsound."[15] The complaint also alleges that Flagstar later acknowledged, pursuant to an agreement with the United States Office of Thrift Supervision, that it had "engaged in unsafe or unsound practices in conducting its operations."[16] The complaint details the December 2008 agreement in which a private equity distressed-debt specialist purchased a seventy-percent stake in Flagstar. Notably, it did so under a New York Stock Exchange emergency provision that permitted the sale to bypass a shareholder approval requirement because any delay was expected to "seriously jeopardize the financial viability of the . . . company."[17] [18]

Our task at this stage of the proceeding is to determine whether the plaintiffs have raised a *plausible* claim that a prudent fiduciary would have discontinued offering Flagstar stock at some point during the class period. After reviewing the factual allegations in the complaint--which go

---

[15]*Id.* at 23-24 ¶ 79 (internal quotation marks omitted).

[16]*Id.* at 30 ¶ 86 (internal quotation marks omitted).

[17]*Id.* at 20-21 ¶ 67.

[18]The defendants do not contend seriously that Flagstar's future was bright throughout the class period. Indeed, they concede that the facts in the complaint suggest that it was reasonable to view Flagstar's viability as uncertain. *See, e.g.*, Appellees' Br. 46 ("While the request [for an emergency exemption from the New York Stock Exchange regulations regarding shareholder approval] may plausibly suggest that Flagstar was in financial jeopardy at that point, fiduciaries are not required to divest a company's stock simply because the company may be close to bankruptcy."); *id.* at 47 ("In the rest of 2009 and early 2010, there were a number of negative developments, such as the increase in non-performing loans above 10%, the Office of Thrift Supervision's supervisory agreement, and negative statements by analysts and others questioning Flagstar's viability."). Despite these concessions, they invite our attention to facts in the amended complaint that, they posit, serve as evidence that a prudent investor would not *necessarily* have stopped offering Flagstar stock as an option under the Plan: "that a fiduciary *could* have reasonably believed it prudent to continue the Flagstar stock investment option." *Id.* (emphasis added). However, as the Eighth Circuit noted in *Braden*, "[j]ust as a plaintiff cannot proceed if his allegations are merely consistent with a defendant's liability, so a defendant is not entitled to dismissal if the facts are merely consistent with lawful conduct." 588 F.3d at 597 (citation omitted) (internal quotation marks omitted).

far beyond documenting a simple drop in stock price to recite announcements from Flagstar itself, statements by analysts and financial media publications, and actions taken by Flagstar suggesting a precarious financial situation--we must conclude that the complaint raises a plausible claim for breach of fiduciary duty.

## CONCLUSION

The district court erred by dismissing this action for failure to state a claim upon which relief can be granted.  Accordingly, we REVERSE its judgment and REMAND for further proceedings.